No. 13,843.

BUKOWICH ET AL. *v.* FORD MOTOR COMPANY ET AL.
(59 P. [2d] 470)

Decided June 29, 1936.

Mr. PAUL P. PROSSER, Attorney General, Mr. M. S. GINSBERG, Assistant, Mr. LOUIS SCHIFF, Assistant, Mr. CARL W. FULGHUM, for plaintiffs in error.

Mr. EDWARD L. WOOD, Mr. NORMAN W. BAKER, for defendants in error.

*En Banc.*

MR. JUSTICE BOUCK delivered the opinion of the court.

THIS case arises under the Workmen's Compensation Act.

Bukowich, the claimant, plaintiff in error here, asks us to reverse the judgment of the Denver district court which vacated an award of compensation by the Industrial Commission in his favor and against the Ford Motor Company, and ordered a dismissal as to that company and its insurance carrier, the Travelers Insurance Company.

▐ Originally the proceedings were instituted by Bukowich against Mansfield Motors, Inc., as employer. He plainly regarded himself as an employee of that corporation, to which for brevity's sake we shall hereafter generally refer as "Mansfield." Later the Ford Motor Company was made a respondent, as was its insurance carrier. Mansfield carried no employer's liability insurance. Of course if the evidence should prove Bukovich to have been the employee of the Ford Motor Company, his own ignorance of the fact would not of itself prevent his being entitled to compensation from that company.

The evidence introduced before the referee of the commission shows that at the time of the accident in question Mansfield was engaged among other things in selling Ford automobiles in and near Glenwood Springs, Colorado, under a written agreement with the Ford Motor Company discussed below. The claimant had been employed by Mansfield to do certain work in connection with its business at Glenwood Springs. His usual duties were to wash and service cars and to do other general work about the Mansfield garage. Early on the morning of May 15, 1934, the claimant drove to Denver with the man-

ager of Mansfield in a car owned by that company, for the purpose of driving back a Ford truck which had been bought by Mansfield from the Ford Motor Company. On the evening of the next day the two men left Denver for Glenwood Springs, the claimant driving the newly purchased Ford truck and the manager driving the car in which they had come to Denver. About 3 a. m. on May 17, approximately three miles from Glenwood Springs, the claimant fell asleep at the wheel. The truck left the road and ran into the Colorado river, the claimant being seriously injured. He contends that he was injured while acting in the course of his employment for Mansfield and further that under the terms of the Act he was an employee of the Ford Motor Company and consequently entitled to compensation from the Ford Company and its insurance carrier. In opposition to the contention that the claimant was the employee of the Ford Motor Company, the latter points out the uncontradicted evidence that his own notice and claim for compensation filed with the commission stated his employer to be Mansfield Motors, Inc.; that he repeatedly stated at the hearing he was the employee of this company; that his wages were paid by the latter and not by the Ford Motor Company; and that his work was directed exclusively by Mansfield Motors, Inc.

Was Bukowich nevertheless the employee of the Ford Motor Company under the Workmen's Compensation Act? To answer this question we must analyze the relations existing between Mansfield Motors, Inc., and the Ford Motor Company.

The contract between these two corporations, which was introduced in evidence, reads in part as follows:

"(1) Company [i. e. the Ford Motor Company] agrees to sell and Dealer [i. e. Mansfield Motors, Inc.] agrees to purchase Ford automobiles, trucks, chassis, automobile bodies, pick-up bodies, truck bodies, cabs, accessories and parts (hereinafter sometimes collectively referred to as Company's 'Products') upon the terms,

conditions and provisions hereinafter specifically set forth and subject to the right reserved to Company to sell to other Dealers and direct to retail purchasers in any part of the United States without obligations for any commission to Dealer on any such sale.

"(7)   Dealer agrees specifically as follows:

"(a)   To maintain a place of business (and only one place of business unless service station is separate from sales room) suitably located and equipped as sales room and service station and acceptable to Company; to conspicuously display effective signs; to carry an adequate stock of genuine Ford parts; to install and maintain tools and machinery in said service station as recommended by Company; to employ competent salesmen; and to make repairs in a workmanlike manner on products of Company whether sold by Dealer or not.

"(h)   Not to use the words 'Ford,' 'Fordson,' or 'Lincoln,' or any other trade-mark or trade name adopted by Company, as a part of Dealer's firm name or trade name.

"(9)   It is further mutually agreed that:

"(b)   Dealer has no authority to make any representation concerning, or on behalf of, Company nor to make any warranty concerning its products, nor in any manner to assume or create obligations on behalf of Company, nor in any manner to act as its agent. Dealer shall at all times permit Company's representative to have access to Dealer's place of business to ascertain the adherence of Dealer to the above and to all other provisions of this agreement.

"(c)   This agreement may be terminated at any time at the will of either party by written notice to the other party given either by registered mail or by personal delivery, and such termination shall also operate to cancel all orders theretofore received by Company and not delivered.

"(h)   The terms of this agreement may not be enlarged, varied, modified or cancelled by any agent or rep-

resentative of Company, except by an instrument in writing executed by the President, Vice President, Secretary, or Assistant Secretary of Company, and Company will not be bound by any alleged enlargement, variation, modification, or agreement not so evidenced.'' The foregoing contract was obviously interpreted, applied, and acted upon by both parties according to its express terms.

As fairly stated by counsel for the Ford Motor Company: ''Mansfield Motors, Inc., although selling Ford products, was in no sense a dealer exclusively in these products. In addition, this Company ran a general garage and storage business for all makes of cars; it handled Conoco gasoline and displayed Conoco signs; it sold products of the Gates Rubber Company, including tires and fan belts, and it displayed signs advertising these products; it handled pyroil and advertised its sale of this product; it sold some Chevrolet parts and other general automobile accessories.''

Moreover, Mansfield did not ever or anywhere display the name Ford Motor Company. It handled no products owned by the latter company. The Ford products—both automobiles and accessories—were purchased outright. They were paid for by Mansfield either in cash on delivery or within sixty days after purchase and in the usual course of business. The fatal truck in this case was paid for in cash at delivery in Denver and the legal title thereof became absolutely vested in Mansfield. The Ford Motor Company had no financial investment in Mansfield. This operated on its own responsibility. It leased its building, owned the entire equipment, and paid the salaries and expenses of its employees. We are not impressed by the argument that Mansfield Motors, Inc., is to be regarded as the employee or agent of the Ford Motor Company for the alleged reason that this company issued list prices of its products on resale or exercised control over the former's business operations. The manufacturer had the right to fix prices for resale and to urge its dealers to abide thereby. It also had a right to define

and prescribe those conditions which it deemed most conducive to the successful retailing of its products and to the supplying of needed repairs and service to those already owning Ford cars so as to make the use of those cars more attractive because of the availability, completeness, and efficiency of the recommended tools, materials and methods. It is clear that these conditions were such as were reasonably desirable from the standpoint both of the Ford company as manufacturer and of Mansfield as retail dealer, with the probable result of bringing about larger and speedier retail sales, of causing the greatest possible satisfaction to the retailer's customers, and of increasing profits and prosperity for wholesaler and retailer alike in the usual channels of disposition for manufactured products. By no legitimate inference from the facts as presented by the record before us can we find the Ford Motor Company to be a corporation "operating, engaged in or conducting any business by * * * contracting out any part or all of the work" thereof to Mansfield Motors, Inc., within the meaning of section 49 of the Act (C. L. §4423).

We therefore hold that Bukowich was not an employee of the Ford Motor Company, and that the judgment of the district court adjudging the Ford company not liable for compensation was right.

Judgment affirmed.